**Office of Disciplinary Counsel v. Lewis**

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

Disciplinary docket no. 117 D.B. 2005.

BROWN, *Member,* January 26, 2007—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On August 1, 2005, Office of Disciplinary Counsel filed a petition for discipline against F. Lee Lewis, respondent. The petition charged respondent with professional misconduct in six separate client matters during a two-year time frame. Respondent did not file an answer to petition.

On December 5, 2005, a joint petition for discipline on consent was filed by the parties and assigned to a three-member Disciplinary Board panel. The board panel denied the joint petition for discipline on consent and the petition for discipline was referred to a Hearing Committee.

A disciplinary hearing was held on March 22, 2006 before a District I Hearing Committee comprised of Chair Marc P. Weingarten, Esquire, and Members Howell K. Rosenberg, Esquire, and Daniel J. Ryan Jr., Esquire. Respondent was represented by Samuel D. Miller, Esquire.

Following the submission of briefs by the parties, the Hearing Committee filed a report on August 11, 2006, finding that respondent engaged in ethical misconduct and recommending that she be suspended for one year and one day.

No briefs on exception were filed by the parties.

This matter was adjudicated by the Disciplinary Board at the meeting on September 20, 2006.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 1400, 200 North Third Street, Harrisburg, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.

(2) Respondent is F. Lee Lewis. She was born in 1945 and was admitted to practice law in the Commonwealth in 1987. Her attorney registration mailing address is 5744 Albans Way, Lithonia GA 30058. Respondent is subject to the jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania.

(3) Respondent has a prior history of discipline. She received an informal admonition in 1998 and a private reprimand in 2005. In connection with the reprimand,

respondent was ordered to return a retainer paid by a client. She failed to do so for two years. The board also ordered respondent placed on probation with a practice monitor for one year. The probation never commenced due to respondent's inability to obtain an attorney who would agree to monitor her practice.

## Charge I—Ruffin Matter

(4) In October of 2002, Marylou Ruffin retained respondent to represent her grandson, Markee J. Ruffin, in the preparation and filing in the United States District Court for the Eastern District of Pennsylvania, a petition for a writ of habeas corpus.

(5) Respondent told Ms. Ruffin that her fee for the representation would be $5,000.

(6) Respondent had not previously represented Ms. Ruffin or Mr. Ruffin.

(7) Respondent did not communicate the basis or rate of her fee, in writing, before or within a reasonable time after commencing the representation.

(8) Over the next several months, Ms. Ruffin satisfied respondent's requested fee of $5,000.

(9) At the outset of the representation or shortly thereafter upon diligent inquiry, respondent failed to advise her client that he was time-barred under the Anti-Terrorism and Effective Death Penalty Act (AEDPA) from filing a petition, and to refund the $5,000 she received from Ms. Ruffin.

(10) Under the AEDPA, a petition had to be filed on or before October 1, 2002.

(11) By letter dated May 1, 2003, addressed to Mr. Ruffin, respondent, inter alia:

(a) advised Mr. Ruffin that she had reviewed the trial documents and the transcripts and that she was in the "research phase";

(b) requested that he write back with any new evidence;

(c) promised to do everything she could to secure his release through the "appellate procedures."

(12) Mr. Ruffin received respondent's letter and, as respondent requested, wrote back to her with a response.

(13) By letter dated June 24, 2003, addressed to Mr. Ruffin, respondent acknowledged receipt of his letter and requested that he respond to her additional requests for information.

(14) Mr. Ruffin received respondent's letter and wrote back to her with a response.

(15) On August 22, 2003, respondent filed the petition in the Eastern District.

(16) On November 25, 2003, the Attorney General of Pennsylvania and the Philadelphia District Attorney's Office filed a response to the petition claiming that it should be dismissed as it was time-barred.

(17) On November 26, 2003, United States Magistrate Judge Peter B. Scuderi filed a report and recommendation, in which he recommended the dismissal of the petition because it was time-barred.

(18) On February 9, 2004, respondent filed objections to the report.

(19) By order dated February 12, 2004, the Honorable Berle Schiller approved and adopted the report and dismissed the petition.

(20) Respondent received a copy of the February 12, 2004 order.

(21) Respondent failed to advise Mr. Ruffin that the petition was dismissed and of his legal options following the dismissal.

(22) Mr. Ruffin was advised by the court of the dismissal of the petition.

(23) By undated handwritten letter, mailed to Mr. Ruffin on March 17, 2004, respondent, inter alia:

(a) Apologized for not promptly responding to Mr. Ruffin's inquiries;

(b) Informed Mr. Ruffin that she had told Ms. Ruffin that she needed another attorney to assist in the appeal;

(c) Enclosed a print advertisement for an attorney named Joseph R. Viola, whom respondent claimed to have retained to help her;

(d) Stated that she would stay in contact with Mr. Ruffin;

(e) Advised Mr. Ruffin that she would help with Mr. Viola's legal fees by paying Mr. Viola $2,000, that Mr. Viola's total fee was $4,000 and that he required an immediate payment of $2,000 to begin work; and

(f) Informed Mr. Ruffin that she would discuss Mr. Viola's retention with Ms. Ruffin.

(24) Respondent failed to have any further contact with either Mr. Ruffin or Ms. Ruffin regarding the legal matter.

(25) By letter dated March 24, 2004, sent to respondent by regular mail, Mr. Ruffin requested that respondent provide him with a copy of all of the documents in his legal file pertaining to the petition.

(26) Respondent received this letter but did not comply with Mr. Ruffin's request.

(27) Sometime thereafter, Mr. Ruffin had a conversation with respondent in which respondent promised to refund a portion of the $5,000 fee.

(28) Respondent failed to refund any portion of the $5,000 fee.

(29) Sometime after respondent's conversation with Mr. Ruffin regarding the refund of the fee, Ms. Ruffin went to respondent's law office located at 1800 J.F.K. Boulevard, Suite 300, Philadelphia, and was informed that respondent was no longer in Pennsylvania, having relocated to Florida.

*Charge II—Brinson Matter*

(30) Sometime in December 2003 or January 2004, David A. Brinson received a solicitation letter from respondent in which she offered her services for bankruptcy, among other things.

(31) After receiving respondent's solicitation letter, Mr. Brinson contacted respondent by telephone and scheduled a meeting at respondent's office in January 2004.

(32) Mr. Brinson appeared at respondent's office for the meeting at the scheduled date and time.

(a) Respondent was not in the office so Mr. Brinson met with an employee named Nadirah Coleman, who identified herself as respondent's paralegal.

(b) Ms. Coleman informed Mr. Brinson that respondent's fee for the representation was $694.

(c) Mr. Brinson paid Ms. Coleman $400, for which he received a receipt.

(33) Mr. Brinson paid the additional fee owed of $294 and received a receipt from Ms. Coleman dated January 10, 2004, which had a "0" marked in the box entitled "Balance Due."

(34) On January 14, 2004, respondent filed a Chapter 13 bankruptcy petition on behalf of Mr. Brinson with the United States Bankruptcy Court for the Eastern District of Pennsylvania.

(35) The documents filed with the court were incomplete.

(36) By order dated January 15, 2004, the bankruptcy court directed that the following documents must be filed by January 29, 2004, unless a timely request for an extension was made, or the case might be dismissed: Attorney disclosure statement; Chapter 13 plan; Matrix; Schedule A-J; SSN (Form B21/Tax ID); Statement of financial affairs; and Summary of schedules.

(37) Respondent received the order.

(38) Respondent failed to file the required documents by January 29, 2004.

(39) Respondent failed to make a timely request for an extension of time to file the required documents.

(40) Sometime after respondent filed the bankruptcy petition, Mr. Brinson contacted respondent to find out the amount of his monthly plan payment.

(41) Respondent told Mr. Brinson that she did not yet know the amount and that he would receive a letter from the assigned U.S. Trustee and a court date.

(42) Mr. Brinson contacted respondent a week later to inform her of his name change; Mr. Brinson had his father, Larry Brinson, drop off paperwork at respondent's office related to the name change.

(43) Shortly thereafter, Mr. Brinson's father contacted respondent by telephone regarding the bankruptcy case and the name change.

(44) Respondent told Mr. Brinson's father that she would address the name change and mentioned that the bankruptcy court wanted the required documents submitted on diskette.

(45) By order dated February 4, 2004, the court dismissed Mr. Brinson's bankruptcy case because of respondent's failure to timely file the required documents.

(46) On February 5, 2004, respondent filed some but not all of the required documents.

(47) Respondent failed to advise her client that his bankruptcy case had been dismissed due to her failure to timely file certain documents.

(48) The bankruptcy court sent a notice to Mr. Brinson advising him of the dismissal of his case.

(49) Mr. Brinson's father contacted respondent on behalf of his son on February 11, 2004. Respondent told the father that she did not file the correct documents and that she did not submit the information required on a computer diskette.

(50) Respondent informed the father that she would re-file the petition.

(51) Respondent failed to re-file a Chapter 13 bankruptcy petition on behalf of Mr. Brinson.

(52) From February 12, 2004, through March 12, 2004, Mr. Brinson left messages on respondent's answering machine. He advised her of the termination of her representation, and requested a copy of his legal file and a refund of the fee he paid.

(53) Respondent told Mr. Brinson that she would contact him on March 22, 2004.

(54) Respondent failed to contact Mr. Brinson, provide him with a copy of his file or refund the unearned portion of the fee.

(55) By letter dated March 29, 2004, sent to respondent by regular mail and facsimile transmission, Mr. Brinson, inter alia;

(a) Advised respondent of his unsuccessful attempts to contact her by telephone;

(b) Requested copies of all documents related to his case;

(c) Expressed his belief that respondent was not providing him with the services he bargained for;

(d) Stated that he had not heard from respondent since he had learned of the dismissal of his bankruptcy case;

(e) Recounted his recent unsuccessful efforts to contact respondent by telephone on March 27, 28, and 29, and respondent's failure to contact him on March 22, 2004, as she had promised; and

(f) Requested that respondent refund the money he paid her if she was unable to provide the services he bargained for.

(56) Respondent received the letter and called Mr. Brinson in response.

(57) Respondent told Mr. Brinson that she was out of town but that she was still working on his case.

(58) Mr. Brinson requested a refund of the fee so that he could retain another attorney. Respondent refused Mr. Brinson's requests.

(59) Sometime in late March 2004, respondent again called Mr. Brinson and told him that she was in the process of re-filing a bankruptcy petition on his behalf but was not sure if she should file now or wait for a date closer to the sheriff's sale.

(60) Mr. Brinson told respondent that she should file immediately and reiterated his request for a refund and the return of his paperwork.

(61) From April 1, 2004, through April 17, 2004, Mr. Brinson left messages on respondent's answering machine requesting that she contact him regarding his legal matter.

(62) Respondent failed to return Mr. Brinson's messages.

(63) On April 21, 2004, Ms. Coleman called Mr. Brinson and told him that he could retrieve his file but that she would contact him about the refund.

(64) Mr. Brinson attempted to pick up his file at respondent's office but was unable to do so as no one was at the office.

(65) Respondent failed to mail to Mr. Brinson a copy of his file.

(66) Respondent failed to contact Mr. Brinson regarding his refund.

(67) Respondent failed to refund the unearned portion of the advance payment of her fee following the termination of respondent's representation of Mr. Brinson.

*Charge III—Fitchett Matter*

(68) In or about June 2003, Gertrude Fitchett was in default of her residential mortgage.

(69) In or about June 2003 respondent mailed an undated solicitation letter to Ms. Fitchett.

(70) Ms. Fitchett telephoned respondent in response to the solicitation letter and respondent returned her call and arranged a meeting on June 26, 2003, at 5 p.m., to meet with an unidentified individual in respondent's office.

(71) On June 26, 2003, Ms. Fitchett went to respondent's office and met with respondent's brother-in-law, a non-lawyer.

(a) The brother-in-law explained to Ms. Fitchett the different types of bankruptcy chapters;

(b) The brother-in-law informed Ms. Fitchett she would need to pay $400 in cash that day; she complied with the request and received a receipt, which indicated that the total amount owed was $1,185.

(c) The brother-in-law had Ms. Fitchett sign a document entitled "Bankruptcy application," which stated that respondent's fee for representing Ms. Fitchett was $1,185, inclusive of costs.

(d) Ms. Fitchett provided the brother-in-law with copies of letters she received from three general unsecured creditors.

(e) Either at this meeting or another meeting in July 2003, the brother-in-law solicited financial information from Ms. Fitchett, including her wages; Ms. Fitchett provided the brother-in-law with one of her wage stubs.

(72) On July 3, 2003, Ms. Fitchett met with respondent at respondent's office and paid her the sum of $190.

(a) Ms. Fitchett asked respondent when she would receive a written fee agreement.

(b) Respondent told Ms. Fitchett that respondent would mail her an agreement.

(c) Respondent provided Ms. Fitchett with a receipt confirming her payment, said receipt also indicating that the total amount due was $1,185.

(73) On July 18, 2003, Ms. Fitchett made another payment of $300 and received a receipt confirming her payment.

(74) By letter dated July 21, 2003, sent to respondent by facsimile transmission, Ms. Fitchett:

(a) Enclosed a letter she received from her mortgage company;

(b) Requested a reply; and

(c) Confirmed that on July 18, 2003, she went to respondent's office and made an additional payment, leaving a balance owed of $295.

(75) Respondent received this letter but failed to respond.

(76) On August 1, 2003, Ms. Fitchett went to respondent's office and met with another individual.

(a) This individual obtained information from Ms. Fitchett regarding her assets, debts, income, and expenses.

(b) Respondent's secretary advised Ms. Fitchett that a bankruptcy case would be filed on her behalf and respondent's office would contact her again.

(c) Respondent's secretary collected a payment of $295 from Ms. Fitchett and provided Ms. Fitchett with a receipt, which showed zero in the box entitled "due."

(77) On August 18, 2003, Ms. Fitchett left respondent a voicemail regarding the filing of the Chapter 13 bankruptcy petition.

(78) By letter dated August 19, 2003, sent to respondent by facsimile transmission, Ms. Fitchett:

(a) Stated that she had left respondent a voicemail on August 18, 2003, regarding the filing of the Chapter 13 bankruptcy petition;

(b) Informed respondent that she was contacting her by facsimile transmission because she had been unable

to reach respondent or anyone else at the office by telephone to ask about receiving a written fee agreement and confirmation that respondent's fee was paid in full; and

(c) Requested that respondent contact her.

(79) Respondent received this letter but failed to provide a written fee agreement and the requested confirmation.

(80) On August 21, 2003, Ms. Fitchett and respondent had a telephone conversation regarding certain paperwork received by Ms. Fitchett which Ms. Fitchett agreed to forward to respondent.

(81) By letter dated August 22, 2003, sent to respondent by facsimile transmission, Ms. Fitchett:

(a) Stated that in accordance with a telephone conversation she had with respondent on August 21, 2003, she was enclosing papers presented to her for respondent's review;

(b) Requested that respondent review and handle the matter; and

(c) Informed respondent that the sheriff's sale was scheduled for November 11, 2003.

(82) Respondent received this letter but did not respond.

(83) On August 24, 2003, Ms. Fitchett hand-delivered to respondent's office, papers Ms. Fitchett had received from her mortgage company.

(84) By letter dated August 25, 2003, sent to respondent by facsimile transmission, Ms. Fitchett:

(a) Confirmed that on August 24, 2003, she hand-delivered to respondent's office, papers she received from her mortgage company; and

(b) Enclosed those papers and requested that respondent handle the matter.

(85) Respondent received this letter but failed to respond to it.

(86) By letter dated October 6, 2003, sent to respondent by facsimile transmission, Ms. Fitchett:

(a) Inquired if respondent had filed a Chapter 13 bankruptcy petition on her behalf;

(b) Informed respondent of her concern that she had yet to receive any paperwork confirming her payment of respondent's fee in full;

(c) Asked when she would receive the plan payment schedule; and

(d) Advised respondent that she had been unable to obtain answers to her inquiries by telephone.

(87) Respondent received this letter but failed to respond.

(88) By letter dated October 30, 2003, sent to respondent by facsimile transmission, Ms. Fitchett requested that respondent contact her regarding an attachment and the Chapter 13 petition.

(89) Respondent received this letter but failed to respond.

(90) From June 2003 through November 2003, Ms. Fitchett would call respondent from time to time and leave voicemail messages.

(91) Respondent failed to return Ms. Fitchett's messages.

(92) Prior to respondent filing a Chapter 13 bankruptcy petition on behalf of Ms. Fitchett, Ms. Fitchett had presented to respondent's secretary copies of the letters she had received from her three general unsecured creditors.

(93) On November 7, 2003, respondent filed a Chapter 13 bankruptcy petition with the United States Bankruptcy Court for the Eastern District of Pennsylvania.

(94) Among the documents respondent filed with the court were the "Declaration concerning debtor's schedules" and the "Declaration regarding the statement of financial affairs."

(a) The declarations were signed, but left undated, by Ms. Fitchett at the request of respondent's secretary.

(b) Ms. Fitchett was not presented with the completed Chapter 13 schedules or the statement of financial affairs at the time she signed the declarations or at any point prior to the filing of the Chapter 13 bankruptcy petition.

(95) On November 7, 2003, respondent filed the completed Chapter 13 plan for Ms. Fitchett's bankruptcy case.

(a) Ms. Fitchett did not review or sign the plan prior to its filing.

(b) Respondent listed herself on the plan as a secured creditor, claiming Ms. Fitchett owed respondent the sum of $1,000 as attorney fees, which statement was not true

because Ms. Fitchett had satisfied respondent's fee in full prior to respondent's submission of the plan.

(96) Among the schedules respondent filed in connection with Ms. Fitchett's bankruptcy case were Schedules F, G and I.

(a) Respondent left blank the Schedule F.

(b) Respondent failed to list on the Schedule G Ms. Fitchett's creditors and the debts owed to them by Ms. Fitchett.

(c) The Schedule I showed gross monthly income and monthly net income in the amount of $2,116, with no payroll deductions listed.

(d) Respondent failed to list Ms. Fitchett's payroll deductions on the Schedule I.

(97) By letter dated November 18, 2003, sent to respondent by facsimile transmission, Ms. Fitchett:

(a) Enclosed a November 10, 2003 order she received from bankruptcy court; and

(b) Requested that respondent contact her regarding the missing documents required by bankruptcy court.

(98) Respondent received this letter and failed to respond to it.

(99) On November 24, 2003, respondent filed with the bankruptcy court an "amended statement pursuant to Rule 2016(b)" in which respondent claimed that she was paid $500, that the total compensation due was $1,500 and that the balance owed was $1,000. The amended statement also stated that respondent was paid the filing fee of $185.

(100) When respondent had filed the amended statement, Ms. Fitchett had already satisfied respondent's fee of $1,185.

(101) In or about December 2003, Ms. Fitchett received a telephone call from a secretary in respondent's office regarding the amount of her Chapter 13 plan payment.

(a) The secretary informed Ms. Fitchett that her plan payment was $111 a month.

(b) Respondent's secretary's advice to Ms. Fitchett to pay $111 a month over 60 months resulted in the plan being overfunded.

(102) The U.S. Trustee, Frederick L. Reigle, Esquire, served respondent with notice of the section 341(a) meeting of creditors, scheduled for January 23, 2004, at 10 a.m. at the Chapter 13 meeting room—The Bourse Building, Suite B 104, South Independence Hall, Philadelphia.

(103) Respondent failed to appear at the meeting on behalf of Ms. Fitchett.

(104) Respondent failed to arrange for substitute counsel to appear at the meeting on behalf of Ms. Fitchett.

(105) Respondent failed to notify either Ms. Fitchett or Mr. Reigle that she would not be attending the meeting.

(106) Ms. Fitchett appeared at the meeting.

(107) The meeting was re-scheduled to March 5, 2004 at 2 p.m. at the same location.

(108) By letter dated January 27, 2003, sent to respondent by regular mail, Mr. Reigle requested a written explanation for respondent's failure to appear at the meeting.

(109) Respondent received this letter but did not respond to it.

(110) Mr. Reigle served respondent with notice of the meeting scheduled for March 5, 2004.

(111) Following the rescheduling of the meeting, Ms. Fitchett made several attempts to reach respondent by telephone, leaving messages requesting that respondent contact her.

(112) Respondent failed to return Ms. Fitchett's calls.

(113) On March 4, 2004, respondent's secretary contacted Ms. Fitchett and told her that respondent would not be able to attend the meeting but that respondent had arranged for Lawrence M. Kagan, Esquire, to appear at the meeting on behalf of Ms. Fitchett.

(114) On the day of the meeting, Mr. Kagan appeared and Ms. Fitchett consented to Mr. Kagan representing her at the meeting.

(115) At the meeting, Ms. Fitchett, for the first time, reviewed with Mr. Kagan the information contained in the completed schedules and the statement of financial affairs that respondent had filed.

(116) At the meeting, Ms. Fitchett testified regarding her three general unsecured creditors.

(117) At the meeting, Mr. Kagan, who had respondent's file for the Fitchett matter, located the letters Ms.

Fitchett provided to respondent's office regarding her three unsecured creditors.

(118) At the meeting, Ms. Fitchett learned that the plan called for her to make monthly payments of $59.01 a month.

(119) At the meeting, Ms. Fitchett had with her copies of her wage stubs, which showed payroll deductions.

(120) On March 5, 2004, Mr. Reigle filed with the bankruptcy court a "motion of the standing trustee for the disgorgement of compensation" and a "United States Trustee's motion for the imposition of sanctions against debtor's counsel for violations of Fed.R.Bank.P. 9011(b)".

(121) Respondent was served with the motions.

(122) On May 14, 2004, a hearing on the motions was held before the Honorable Stephen Raslavich.

(123) Respondent was present at the hearing.

(124) By opinion and order dated May 21, 2004, Judge Raslavich granted the motions and, inter alia, directed respondent to disgorge all fees paid to respondent by Ms. Fitchett.

(125) Judge Raslavich found that respondent violated Bankruptcy Rule 9011, which is titled "Signing of papers, representations to the court; sanctions; verification and copies of papers."

## Charge IV—Thornton Matter

(126) In or about April 2003, Tyesha Thornton was in default of her residential mortgage with Cendant Mortgage Company.

(127) Respondent mailed an undated solicitation letter to Ms. Thornton. Ms. Thornton contacted respondent in response to respondent's solicitation letter.

(128) Ms. Thornton retained respondent to file a Chapter 13 bankruptcy petition on her behalf.

(129) Respondent's fee for representing Ms. Thornton was $1,200 and a filing fee of $185.

(130) Respondent had not previously represented Ms. Thornton.

(131) Respondent failed to communicate the basis or rate of her fee, in writing, before or within a reasonable time after commencing the representation.

(132) From April 28, 2003 through October 23, 2003, Ms. Thornton made payments to respondent in varying sums, for which she received receipts, until respondent's fee was satisfied in full.

(133) By letters dated May 2, 2003, and May 6, 2003, signed by Ms. Thornton, Ms. Thornton authorized Cendant to provide respondent with information regarding her mortgage.

(134) On November 7, 2003, respondent filed a Chapter 13 bankruptcy petition on behalf of Ms. Thornton with the United States Bankruptcy Court for the Eastern District of Pennsylvania.

(a) The Chapter 13 plan respondent filed called for Ms. Thornton to make monthly payments of $101.52 to Cendant to satisfy an arrearage of $6,000.

(b) The "statement pursuant to Rule 2016(b)" respondent filed with the bankruptcy court claimed that respondent was paid $1,000, that the total compensation due was $1,500, and that the balance owed was $500.

(c) The statement also stated that respondent was paid the filing fee of $185.

(d) When respondent had filed the statement, Ms. Thornton had already satisfied respondent's fee of $1,000.

(135) The United States Trustee, William C. Miller, Esquire, served respondent with notice of the section 341(a) meeting of creditors scheduled for December 29, 2003.

(136) Ms. Thornton received notice of the meeting.

(137) Respondent advised Ms. Thornton that her attendance was not required at the meeting.

(138) Based on respondent's advice, Ms. Thornton did not attend the meeting.

(139) On January 5, 2004, Mr. Miller filed a motion for dismissal based on Ms. Thornton's failure to appear at the meeting.

(140) Respondent received a copy of the motion.

(141) Respondent failed to file an answer to the motion that explained that respondent had counseled Ms. Thornton not to appear at the meeting and that requested a rescheduling of the meeting.

(142) On January 6, 2004, counsel for Cendant filed an objection of Cendant Mortgage Corporation f/k/a PHH Mortgage Services Corporation to confirmation of the debtor's Chapter 13 plan.

(143) The objection alleged that the Chapter 13 plan was under-funded, in that the amount of pre-petition arrears was $10,607.23.

(144) Respondent received the objection.

(145) Respondent failed to prepare and file an amended Chapter 13 plan on behalf of Ms. Thornton that would satisfy her arrearage to Cendant.

(146) On February 19, 2004, the bankruptcy court granted the motion and dismissed Ms. Thornton's case.

(147) Thereafter Ms. Thornton retained respondent to file a second bankruptcy petition.

(148) Prior to respondent filing the second petition, Ms. Thornton paid respondent the sum of $695, $195 towards the filing fee and $500 towards respondent's fee.

(149) On June 7, 2004, respondent filed a second Chapter 13 bankruptcy petition on behalf of Ms. Thornton with the United States Bankruptcy Court for the Eastern District of Pennsylvania.

(150) The second Chapter 13 plan respondent filed again called for Ms. Thornton to make monthly payments of $101.52 to satisfy an arrearage to Cendant of $6,000.

(151) Respondent failed to obtain updated information from either Ms. Thornton or Cendant regarding the amount of the arrearage, and respondent failed to prepare

a second Chapter 13 plan that allowed Ms. Thornton to satisfy her arrearage to Cendant.

(152) On July 1, 2003, counsel for Cendant filed an objection to the Chapter 13 plan.

(153) The second objection alleged that the second Chapter 13 plan was under-funded, and the amount of pre-petition arrears was $14,859.26.

(154) On September 2, 2004, the bankruptcy court removed respondent as counsel for Ms. Thornton.

## Charge V—Jackson Matter

(155) In or about January 2004, Winifred Y. Jackson was in default of her residential mortgage to Mellon Bank.

(156) In or about January 2004, respondent mailed an undated solicitation letter to Ms. Jackson.

(157) Respondent's solicitation letter contained a heading that was misleading, as it gave the impression that respondent was operating a law practice in association with other attorneys. The letter also gave the impression that respondent's office associated with or operated a mortgage refinancing company.

(158) Ms. Jackson arranged to meet with respondent on January 12, 2004.

(159) Respondent informed Ms. Jackson that her fee was $500.

(160) On January 12, 2004, Ms. Jackson went to respondent's office and met with respondent's paralegal named "Jan."

(161) Jan told Ms. Jackson that respondent was out of the office and would contact her.

(162) Ms. Jackson provided Jan with a $400 money order and with copies of personal financial documents.

(163) Respondent had not previously represented Ms. Jackson.

(164) Respondent failed to communicate to Ms. Jackson the basis or rate of her fee, in writing, before or within a reasonable time after commencing the representation.

(165) After several days, Ms. Jackson began placing telephone calls to respondent's office over a two-week period and left messages requesting that respondent contact her.

(166) Respondent failed to return Ms. Jackson's messages.

(167) On or about January 27, 2004, Ms. Jackson finally reached respondent by telephone.

(a) Respondent told Ms. Jackson that she was out of town.

(b) Respondent informed Ms. Jackson that she required an additional payment of $294 before respondent would file a bankruptcy petition on Ms. Jackson's behalf.

(c) Respondent directed Ms. Jackson to send the $294 payment to respondent's paralegal, Nadirah Coleman, via Western Union.

(168) On January 27, 2004, Ms. Jackson sent a $294 payment to Ms. Coleman via Western Union.

432

(169) Shortly thereafter Ms. Coleman went to Ms. Jackson's residence to have her sign some documents.

(170) From time to time, Ms. Jackson telephoned respondent and left messages, inquiring as to the name and address of the U.S. Trustee to whom she would be mailing payments and the amount of the payments. Respondent failed to return Ms. Jackson's messages.

(171) On February 2, 2004, respondent filed a Chapter 13 bankruptcy petition on behalf of Ms. Jackson with the United States Bankruptcy Court for the Eastern District of Pennsylvania.

(172) The documents respondent filed with the bankruptcy court were incomplete.

(173) By order dated February 4, 2004, the bankruptcy court directed that certain documents had to be filed by February 19, 2004, unless a timely request for an extension was made, or the case might be dismissed: Attorney disclosure of compensation; Chapter 13 plan; Matrix; all schedules; SSN statement of financial affairs; and summary of schedules.

(174) Respondent received the order.

(175) Respondent failed to file the required documents by February 19, 2004.

(176) Sometime in February 2004, respondent left a message for Ms. Jackson on her answering machine requesting that she come into respondent's office to sign papers.

(177) Ms. Jackson immediately returned respondent's message and left respondent several messages, advising

that she was out of work on sick leave and could not stop by respondent's office.

(178) Ms. Jackson requested that respondent mail her the papers she had to sign and she would complete and sign the paperwork, returning them to respondent by mail.

(179) Respondent failed to return Ms. Jackson's messages or to mail the documents to Ms. Jackson.

(180) Respondent failed to make a timely request to the bankruptcy court for an extension of time to file the required documents.

(181) By order dated March 1, 2004, the bankruptcy court dismissed Ms. Jackson's bankruptcy case.

(182) Respondent failed to advise Ms. Jackson that her case had been dismissed and that the court dismissed it due to respondent's failure to timely file the required documents.

(183) The bankruptcy court sent a notice to Ms. Jackson advising her of the dismissal of her case.

(184) Ms. Jackson immediately called respondent and left respondent a message requesting that she return the telephone call.

(185) Over the next several days, Ms. Jackson tried reaching respondent by telephone, without success.

(186) Ms. Jackson finally contacted respondent by telephone and asked respondent to explain why her case was dismissed.

(a) Respondent told Ms. Jackson that the case was dismissed because Ms. Jackson had not come in to sign the paperwork.

(b) Ms. Jackson answered by asking respondent why she had not contacted her to make other arrangements to sign the necessary papers.

(187) On March 10, 2004, Ms. Jackson met with respondent at respondent's office.

(a) Respondent told Ms. Jackson that she would have to re-file a bankruptcy petition on Ms. Jackson's behalf and that she would charge Ms. Jackson $595.

(b) Respondent directed Ms. Jackson, who did not have the funds requested on her person, to send respondent the money via Western Union.

(188) On March 10, 2004, Ms. Jackson sent respondent the $595 payment via Western Union.

(189) Thereafter Ms. Jackson left respondent a message informing her that she had sent the $595 payment and that respondent should call her to confirm the receipt of the funds.

(190) Respondent failed to contact Ms. Jackson.

(191) Over the next several weeks, Ms. Jackson would telephone respondent to ascertain the status of her case.

(192) Respondent failed to return Ms. Jackson's messages.

(193) On or about April 13, 2004, Ms. Jackson received a certified letter from Lauren R. Berschler, Esquire, a member of the law firm representing Ms. Jackson's mortgage company.

(194) Ms. Jackson immediately contacted respondent and left several messages.

(195) Ms. Jackson made a visit to respondent's office to discuss the letter but was told by respondent's staff that she was out of town.

(196) After repeated telephone calls, Ms. Jackson finally made contact with respondent on April 24, 2004.

(a) Ms. Jackson informed respondent of the contents of Ms. Berschler's letter.

(b) Ms. Jackson sent respondent the letter via facsimile transmission.

(c) Respondent received Ms. Jackson's facsimile transmission.

(197) Ms. Jackson waited several days to hear from respondent and then decided to contact Ms. Berschler by telephone.

(198) Ms. Jackson learned from Ms. Berschler that respondent had not contacted Ms. Berschler; Ms. Jackson also found out that a second bankruptcy petition had not been filed.

(199) Over several weeks, Ms. Jackson telephoned respondent from time to time and left respondent messages.

(200) Respondent failed to respond.

(201) On or about May 26, 2004, Ms. Jackson received a second letter from Ms. Berschler dated May 25, 2004.

(a) The letter, inter alia, informed Ms. Jackson that Mellon Bank had acquired her residence at a sheriff sale that took place on May 4, 2004.

(b) Ms. Jackson was also advised that possession of her residence must be surrendered immediately to Mellon Bank.

(202) On June 3, 2004, Ms. Jackson sent respondent Ms. Berschler's letter by certified mail, restricted delivery.

(203) Respondent received this letter.

(204) On June 7, 2004, Ms. Jackson received a telephone call from respondent.

(a) Respondent asked Ms. Jackson to explain her reason for having mail delivered to her office by certified mail.

(b) Ms. Jackson replied that she did not receive a response to prior correspondence and wanted to be certain that respondent received her correspondence.

(c) Respondent claimed that she had not received any facsimile transmission from Ms. Jackson.

(d) Respondent told Ms. Jackson that she could not be forced to leave her residence and that respondent would either contact respondent's realtor or attempt to secure a loan so that Ms. Jackson could pay off Mellon Bank.

(e) Ms. Jackson asked respondent to explain why she had not filed the second bankruptcy petition.

(f) Respondent failed to answer Ms. Jackson's inquiry.

(205) Approximately one week later, Ms. Jackson placed a telephone call to respondent's office to get an update on her matter.

(206) Respondent told Ms. Jackson that she was continuing to work on the legal matter.

(207) After speaking with respondent, Ms. Jackson placed a telephone call to Ms. Berschler and learned that respondent had not had any contact with Ms. Berschler.

(208) Ms. Jackson then contacted respondent by telephone and informed her of her conversation with Ms. Berschler.

(209) Respondent told Ms. Jackson not to call Ms. Berschler and to leave the communication to respondent.

(210) Sometime thereafter, Ms. Jackson placed a call to respondent at her office number and received a message that the office number was disconnected.

(211) Ms. Jackson reached respondent at respondent's cell number. Respondent told Ms. Jackson that she no longer had an office.

(212) Respondent failed to file a second bankruptcy petition on behalf of Ms. Jackson.

(213) Respondent failed to have any further contact with Ms. Jackson regarding her legal matter.

(214) Respondent failed to refund the unearned advance payment of respondent's fee and to provide Ms. Jackson with her legal file.

*Charge VI—Nasir Matter*

(215) In or about June 2004, Eugene Day Nasir and his wife Lakiia Nasir, were in default of their residential mortgage.

(216) In or about June 2004 respondent mailed an undated solicitation letter to Mr. and Mrs. Nasir.

(217) Respondent's letter created the false impression that she was operating a law practice in association with other attorneys and that her office was associated with or operated a mortgage refinancing company.

(218) On June 7, 2004, Mr. and Mrs. Nasir telephoned respondent and arranged a meeting on June 8 at Magee Rehabilitation Hospital where Mr. Nasir was recuperating from surgery.

(219) Respondent told the Nasirs that her fee was $400 to be paid in cash.

(220) On June 8, 2004, respondent met with the Nasirs at the hospital.

(a) Respondent told the Nasirs that she could begin working immediately on refinancing their mortgage and negotiating an agreement with their mortgage company.

(b) Respondent informed the Nasirs that she would file a Chapter 13 bankruptcy petition if she was unsuccessful in refinancing the mortgage.

(c) Respondent provided the Nasirs with the name of a mortgage broker and told them she would contact another mortgage broker she knew.

(d) The Nasirs paid respondent $400 in cash.

(e) Respondent gave the Nasirs a business card that related to respondent's ministry work and wrote on the back of the card the date of June 8, 2004 and that she received $400.

(f) Respondent told the Nasirs that she was leaving Philadelphia the next day but that she would contact the mortgage broker and the mortgage company while she was away and that she would contact them on June 14, 2004.

(g) Respondent was told that the date of the sheriff's sale was July 16, 2004.

(221) Respondent had not previously represented the Nasirs.

(222) Respondent failed to communicate the basis or rate of her fee, in writing before or within a reasonable time after commencing the representation.

(223) Respondent failed to contact the Nasirs by June 14, 2004. On June 16, 18, 21 and 22, 2004, the Nasirs left messages on respondent's answering machine, requesting that she return their telephone calls.

(224) On June 30, 2004, respondent called the Nasirs and requested that they prepare a letter addressed to the mortgage company giving respondent permission to obtain information regarding their mortgage.

(225) On July 1, 2004, Ms. Nasir personally hand-delivered the requested letter and left it with respondent's secretary.

(226) Over the next several days, Ms. Nasir spoke and met with a mortgage broker whose name respondent provided.

(227) Ms. Nasir asked the mortgage broker if he had been in contact with respondent regarding their refinancing options.

(228) The broker replied that he had only one conversation with respondent, which was approximately the day after the June 8, 2004 meeting.

(229) On July 2, 2004, respondent called the Nasirs and stated that she had not contacted them earlier because she was sick.

(230) Following respondent's telephone conversation with the Nasirs, Mr. Nasir called the representative of the mortgage company who was handling their account.

(a) The representative told Mr. Nasir that respondent had not contacted her.

(b) The representative informed Mr. Nasir that it was too late to reinstate their mortgage and that filing for bankruptcy was the only option.

(231) Thereafter, the Nasirs left several messages for respondent on her answering machine requesting a return telephone call.

(232) On the evening of July 8, 2004, respondent called the Nasirs.

(a) Respondent apologized for not contacting the Nasirs earlier, explaining that she had some "important issues" to handle.

(b) Ms. Nasir expressed to respondent her displeasure with respondent's failure to attend to their legal matter.

(c) Ms. Nasir also informed respondent that she should have directed her secretary to contact them so that they knew of respondent's unavailability.

(d) Respondent again apologized and told the Nasirs that she had a "friend" that she would contact and that she would arrange for that person to file a Chapter 13 bankruptcy petition on their behalf.

(e) Respondent informed the Nasirs that she would call them the following day with additional information and to gather information from them and that she would arrange a joint meeting with respondent's "friend" on Monday, July 12, 2004.

(233) On July 13, 2004, respondent contacted the Nasirs.

(a) Respondent explained that she had not contacted them on July 12, 2004, because she was "out of town".

(b) Respondent told the Nasirs that she could arrange for a meeting to secure the information needed for filing the Chapter 13 bankruptcy petition.

(c) The Nasirs informed respondent that they no longer needed her services and requested a partial refund of the $400 fee they paid respondent.

(d) Respondent agreed to a partial refund and told the Nasirs that she would send them a refund check within a week after reviewing her "records".

(234) On July 21, 2004, Ms. Nasir called respondent at her office telephone number to inquire about the refund and reached a recording stating that respondent's office telephone number was disconnected.

(235) The Nasirs called respondent at her cell phone number.

(a) Respondent told the Nasirs that she had not prepared and mailed a refund check because her office had

relocated and she did not have their address and correct spelling of their names.

(b) Ms. Nasir provided respondent with the information.

(c) Respondent told the Nasirs that she would mail a refund check that week and they should receive it by July 26, 2004.

(236) On July 27, 2004, the Nasirs called respondent's cell phone and left a message with the woman who answered the call.

(237) On July 30, 2004, the Nasirs called respondent's cell phone and left another message on her voicemail, informing respondent of their intention to file a complaint against her.

(238) Respondent failed to respond to the message and failed to refund the unearned portion of the advance payment of her fee.

### Additional Findings

(239) In addition to practicing law, respondent has been active in ministry since approximately 1990, having received training in the ministry at Holy Temple Church of God in Christ, where she was ordained as an evangelist.

(240) Respondent served as the pastor of her own church, Vessels of Honor Worship Center located on Fitzwater Street in Philadelphia, from 1996 until 2004.

(241) Since late February 2006 respondent has been conducting her own ministry in Lithonia, Georgia, where she currently lives.

(242) Respondent deeply regrets her misconduct.

## III. CONCLUSIONS OF LAW

By her conduct as set forth above, respondent violated the following Rules of Professional Conduct:

(1) R.P.C. 1.1—A lawyer shall provide competent representation to a client.

(2) R.P.C. 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client.

(3) R.P.C. 1.4(a)—A lawyer shall keep a client informed about the status of a matter and promptly comply with reasonable requests for information.

(4) R.P.C. 1.4(b)—A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation.

(5) R.P.C. 1.5(a)—A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee.

(6) R.P.C. 1.5(b)—When a lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, in writing, before or within a reasonable time after commencing the representation.

(7) R.P.C. 1.15(b)—Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person

is entitled to receive and, upon request by the client or third person, shall render a full accounting regarding such property.

(8) R.P.C. 1.16(d)—Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

(9) R.P.C. 3.3(a)(1)—A lawyer shall not knowingly make a false statement of material fact or law to a tribunal.

(10) R.P.C. 4.1(a)—In the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person.

(11) R.P.C. 5.3(c)(1)—With respect to a non-lawyer employed or retained by or associated with a lawyer, a lawyer shall be responsible for the conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved.

(12) R.P.C. 5.3(c)(2)—With respect to a non-lawyer employed or retained by or associated with a lawyer, a lawyer shall be responsible for the conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if the lawyer is a partner in the law firm in which the person is em-

ployed, or has direct supervisory authority over the person, and in either case knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

(13) R.P.C. 5.5(a)—A lawyer shall not aid a non-lawyer in the unauthorized practice of law.

(14) R.P.C. 7.1(a)—A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading.

(15) R.P.C. 7.5(a)—A lawyer shall not use a firm name, letterhead or other professional designation that violates Rule 7.1.

(16) R.P.C. 8.4(a)—It is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another.

(17) R.P.C. 8.4(c)—A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

(18) R.P.C. 8.4(d)—A lawyer shall not engage in conduct that is prejudicial to the administration of justice.

## IV. DISCUSSION

This matter is before the board for consideration of the petition for discipline filed against respondent charging her with multiple violations of the Rules of Profes-

sional Conduct relating to her handling of six separate client matters. Respondent has acknowledged her misconduct and entered into joint stipulations of fact and law. The board's responsibility is to determine the appropriate sanction to address the misconduct.

Respondent acknowledges that a suspension is appropriate. She seeks a suspension of one year and one day. Petitioner contends a minimum two-year suspension is warranted. The Hearing Committee recommended a suspension of one year and one day, emphasizing respondent's complete cooperation, acknowledgement of wrongdoing, and decisions in prior disciplinary cases.

The board's review of disciplinary matters is de novo; the board may adopt or reject the findings, conclusions and recommendation of the Hearing Committee after careful consideration of the matter. Pa.R.D.E. 205(c) (6); *In re Anonymous No. 22 D.B. 85,* 45 D.&C.3d 249 (1987). Our review of the instant matter leads to the conclusion that a two-year suspension is warranted. The underlying facts of the misconduct are quite serious. In six separate matters respondent engaged in extensive wrongdoing. Respondent's clients were far from well-represented; indeed, they were neglected. Time and again, respondent took on cases and failed to follow through on the representation; failed to comply with court orders and attend meetings; failed to communicate; failed to provide written fee agreements; and failed to return client files and/or refund advance payments of fees that were not earned. Respondent's clients were harmed by her actions. Furthermore, respondent mailed solicitation letters to four of her clients that contained

misleading information, and she approved of her non-lawyer assistant meeting with and providing a client with legal advice on bankruptcy without respondent being present.

This is not respondent's first encounter with the disciplinary system. She has a prior record of discipline consisting of an informal admonition imposed in 1998 and a private reprimand imposed in 2005. The focus of the reprimand was on respondent's mishandling of two bankruptcy matters and her failure to return a retainer paid by a client. In conjunction with the reprimand the board ordered respondent placed on probation with a practice monitor. However, respondent claimed she could not obtain an attorney who would agree to monitor her practice and thus the probation never commenced.

The board is mindful of respondent's cooperation and her sincere expressions of remorse and recognition of wrongdoing. While this acknowledgement of wrongdoing is certainly viewed with favor as it is an important step in repairing the damage respondent has done to her clients and the public in general, it cannot justify or excuse respondent's harmful actions. The widespread nature of the neglect calls for more severe action than a suspension of one year and one day. An examination of disciplinary case law involving similar misconduct suggests that a two-year period of suspension is an appropriate response to the instant misconduct. *Office of Disciplinary Counsel v. Bentivegna,* no. 156 D.B. 2002, 70 D.&C.4th 202 (2004); *Office of Disciplinary Counsel v. Bolno,* 162 D.B. 2000, 812 Disciplinary Docket no. 3 (Pa. March 7, 2003); *In re Anonymous Nos. 52,*

*79 and 116 D.B. 92 and 30 D.B. 93,* 24 D.&C.4th 447 (1994).

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that the respondent, F. Lee Lewis, be suspended from the practice of law for a period of two years.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Member Baer did not participate in the adjudication.

Board Members Gephart, Wright and Saidis recused.

## ORDER

And now, April 13, 2007, upon consideration of the report and recommendations of the Disciplinary Board dated January 26, 2007, it is hereby ordered that F. Lee Lewis is suspended from the bar of this Commonwealth for a period of two years, and she shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

Mr. Justice Fitzgerald did not participate in this matter.